# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                Plaintiff,

v.

(1) Michael John Markwald,

                Defendant.

Crim. No. 21-21 (ECT/BRT)

**REPORT AND
RECOMMENDATION**

---

Ruth Shnider, Esq., Assistant United States Attorney, counsel for Plaintiff.

Robert A. Lengeling, Esq., counsel for Defendant Markwald.

---

BECKY R. THORSON, United States Magistrate Judge.

Law enforcement officers investigated Defendant Michael John Markwald, along with other individuals, for various drug related offenses during the fall of 2019 and throughout 2020. On January 26, 2021, Markwald was indicted on one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A). (Doc. No. 1.) This matter is before the Court on Defendant Markwald's Motion to Suppress Evidence from Illegal Search and Seizure (Doc. No. 52), wherein he seeks to suppress evidence obtained through the execution of six search warrants (three seeking data from Facebook, and three premises search warrants):

(1) May 12, 2020 PRTT/Tracking Warrant for Facebook account Mike.Markwald.79 (Gov't Ex. 1);

(2) June 19, 2020 Warrant for Historical Data from Facebook account Mike.Markwald.79 (Gov't Ex. 2);

(3) August 24, 2020 Warrant for Historical Data from Facebook account Emjay.Darkwald (Gov't Ex. 3);

(4) Warrant to Search Premises on Old Constance Blvd (Gov't Ex. 4);

(5) Warrant to Search Premises on Highway 65 (Gov't Ex. 5); and

(6) 1st Warrant to Search Premises on Pierce Place (Gov't Ex. 6).

(*See* Doc. No. 71, 6/21/21 Exhibit List.)[1] The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

This Court held a motion hearing on June 21, 2021, at which the above referenced six exhibits were received. (Doc. Nos. 70, 71.) Thereafter, the parties filed post-hearing briefs. (Doc. Nos. 75, 76.) Upon receipt of the post-hearing briefs, the Court stated the following in a Text Order:

> The Court is in receipt of the parties' post-hearing briefs. (Doc. Nos. 75, 76.) Because Defendant has raised additional arguments regarding the search warrants that were not previewed in his original motion to suppress (i.e., lack of particularity), and because the Government now seeks to present additional evidence in the form of exhibits to support the application of the *Leon* exception, the Court hereby finds it necessary for an additional hearing to receive further argument on the issues and for the parties to present any further evidence.

---

[1]    In his post-hearing brief filed on July 12, 2021, Defendant "ask[ed] the Court to do a 'four corners' review [of] each search warrant for probable cause." (Doc. No. 75, Def.'s Mem. of Law in Supp. of Mot. to Suppress Evidence 1.)

(Doc. No. 77.) The Court held that additional hearing on September 1, 2021, at which Anoka County Detective Jonathan Tschida testified and the Court received seven additional exhibits. (Doc. Nos. 81, 82.) Detective Tschida is the author of all six warrant applications at issue. On September 22 and October 6, 2021, the parties filed supplemental post-hearing memoranda. (Doc. Nos. 86, 87.)

This Court addresses the six search warrants at issue below. For the reasons stated, this Court recommends that Defendant Markwald's motion with respect to each search warrant be denied.

## DISCUSSION

### I. Probable Cause Standard

The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

3

Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

In addition, a warrant "must particularly describe the things to be seized, as well as the place to be searched." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quotations omitted). This particularity requirement is met when the warrant is "sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014). Courts review the particularity of a warrant based on factors such as "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). "Although courts sometimes treat particularity and breadth synonymously, . . . technically speaking, particularity and breadth of a warrant are separate issues." *United States v. Brown*, No.

4

19-cr-110 (ADM/ECW), 2019 WL 7838276, at *11 (D. Minn. Sept. 20, 2019), *report and recommendation adopted*, 2019 WL 6607240 (D. Minn. Dec. 5, 2019). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quoting *In re Grand Jury Subpoenas*, 926 F.2d 847, 856–57 (9th Cir. 1991)).

## II.    Facebook Warrants

Defendant challenges three search warrants issued to Facebook during law enforcement's investigation into Markwald's methamphetamine distribution activity. These three warrants are addressed below.

### A.  May 12, 2020 Facebook Warrant

On May 12, 2020, as part of a narcotics investigation, Anoka Hennepin Narcotics and Violent Crimes Task Force Detective Jon Tschida obtained a warrant authorizing the installation and "use [of] a pen register, trap and trace device including electronic tracking device, cellular tower location and service information, including Global Positioning System (GPS) technology information, precision location technology, and tracking warrant" on an Internet Service account from Facebook using the username "Mike.Markwald.79." (Gov't Ex. 1 at 00000362, 00000364.) The warrant allowed law enforcement "to record the date, time, source, and addressing location information of the electronic messages sent from or received by the subject Internet account, port numbers associated with the target account, and source and destination information (Internet addresses) of the messages for the time period of 09/06/2019 to Present and extending

5

sixty (60) days past the date of this Order, to encompass information regarding the true source of the communication without geographic limitation . . ." (*Id.* at 00000364.) In addition, the warrant authorized the release of the following information:

> a) Basic User Identity information, including other user id's associated with this account, email addresses, zip code, city, country, account creation date and time; and the IP address at time of sign-up.
>
> b) IP address logs; Logs showing the IP address assigned to the user and the date stamp at the time the user accessed his or her profile (PST or PDT, depending on the date of log in) . . .
>
> c) Stored user files (photos, videos, blogs); Profile information including photos, videos, blogs, blog comments by other users, the identities of their friends, and "about Me" entries.
>
> d) Other general records or information; user's date of birth, gender[,] hometown, and occupation, as well as historical private message header information, excluding subject . . .
>
> e) Information about the location of the Target Account ID Mike.Markwald.79 includes all available Phase II data, latitude-longitude data, and other precise location information . . . .

(*Id.* at 00000365.)

Detective Tschida explained in his affidavit in support of the warrant that he had learned from a cooperating defendant ("CD") in October 2019 that the CD had "picked up a large quantity of methamphetamine from [Mike Markwald] who was moving several pounds of methamphetamine a week." (*Id.* at 00000356.) The CD also told Tschida that Markwald lived in the area of Constance Blvd. in Andover, Minnesota. (*Id.*) Detective Tschida stated in his affidavit that he was "familiar with Markwald" and that he was "aware Markwald's parents live at [a certain address on] Constance Blvd[.] NW, Andover MN[.]" (*Id.*)

6

Detective Tschida also explained in his affidavit that in December 2019 the following events occurred: (1) he recovered 2.5 pounds of methamphetamine at another target location where the suspect admitted to possessing the methamphetamine and where that suspect's source of supply was supposed to be Markwald; (2) a confidential informant ("CI") told Tschida that the 2.5 pounds of methamphetamine found in December 2019 was purchased from Markwald and that they had intimate knowledge of Markwald's operation, including that Markwald ran his operation out of—and kept significant "weight" at—a shop in Ham Lake (and provided the location); and (3) he conducted continued surveillance at the shop identified in Ham Lake and saw "several known drug dealers coming and going from the shop," as well as "Markwald's vehicles coming and going from the shop." (*Id.*)

Relating specifically to Markwald's Facebook usage, Detective Tschida stated the following:

> 4. Your affiant continued an investigation into Markwald into 2020. Your affiant was able to identify several of Markwald's customers through various investigations. In March of 2020 your affiant assisted Det. Arneson, with the same Task Force, with an investigation into one of Markwald's distributors, [R.P.]. During a search warrant of [R.P.'s] apartment he was found to be in possession of approximately 2 pounds of suspected methamphetamine. During a search of his cellphone pursuant to the warrant [R.P.] had several Facebook messages between him and Markwald solidifying Markwald as his source of supply.

> 5. In April of 2020 your affiant executed an investigation into a different distributor of Markwald's, [R.C.G.]. Your affiant executed a search warrant at [R.C.G.'s] residence in the City of Coon Rapids where [R.C.G.] was found to be in possession of just under a pound of suspected methamphetamine. During an examination of [R.C.G.'s] phone there were several Facebook messages between [R.C.G.] and Markwald confirming Markwald was one of [R.C.G.'s] sources of supply.

7

6. Your affiant has continued to monitor Markwald since the execution of these warrants. Markwald has continued to engage in activity consistent with narcotics distribution. In May of 2020 your affiant received screen shots from a CI regarding Markwald's operation. This information included an admission of continued narcotics dealing. This screen shot was from the Facebook Messenger app.

7. Throughout this investigation into Markwald it appears his main method of communication is through the Facebook Messenger application. Receiving this information from Facebook would allow your affiant to continue to expand the investigation into Markwald and his drug distribution network.

(*Id.* at 00000356–57.) In addition, supporting his request for tracking and location information through Facebook, Detective Tschida explained that Markwald switched vehicles frequently and was known to check his cars for GPS trackers. (*Id.* at 00000357.) On May 12, 2020, the warrant issued and was executed on Facebook. (*Id.* at 00000352.)

Markwald objects to the May 12, 2020 search warrant on the grounds that it invades his expectation of privacy in his Facebook account, lacks indicia of reliability as to the confidential informants, and is unconstitutionally overbroad. (Doc. No. 75 at 4.)

Regarding Defendant's first argument, he generally asserts that "[t]he digital footprint his Facebook usage produced is more private than simple phone data because it implicates more about Markwald's life." (*Id.* at 6.) He asks the Court "to find his privacy interest in his Facebook account outweighs the request by law enforcement as it relates to Exhibit 1." (*Id.*) Defendant cites no caselaw supporting his theory that a right to privacy in the tracking of a Facebook account must override a probable cause finding supporting the issuance of a warrant. But more importantly, it is probable cause supporting a warrant that makes the search and seizure constitutional, even when privacy interests are at stake.

*See United States v. Regan*, 525 F.2d 1151, 1155 (8th Cir. 1975) ("[T]he rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests – individual privacy on the one hand, and the practical needs of law enforcement on the other.") (quotations omitted); *see also Matter of Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1016 (N.D. Cal. 2019) ("[T]he Government may obtain any Facebook Messenger communications from Facebook under the Stored Communications Act or warrant based on probable cause."). Here, law enforcement's interests in investigating a potentially large methamphetamine distribution network was great when measured against Defendant's privacy interests in his Facebook account. This is especially true here where Defendant has not put forth any evidence showing that he kept his Facebook communications, posts, or other activity private. *Cf. United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) ("Whether the Fourth Amendment precludes the Government from viewing a Facebook user's profile absent a showing of probable cause depends, *inter alia*, on the user's privacy settings."). And, even if he did hold portions of his Facebook account private, law enforcement's interests here weighed heavier than Defendant's interests in the location and general information from his Facebook account requested through this warrant.

Regarding Defendant's second argument concerning the reliability of informants, information provided by the CI and CD to Detective Tschida was corroborated either through direct observation of Markwald's Facebook account, through surveillance – including, for example, that Markwald's vehicles (as well as other known drug dealers)

were seen coming and going from the Ham Lake shop, and through learning that the

address of Markwald's parents matched the location for where the CD told Tschida that

Markwald lived. Simply because the affidavit did not provide the factual basis for either

the CI's or the CD's knowledge regarding Markwald's drug dealings or other information

provided, or that the affidavit did not state that the informants had worked reliably with

the officer before, does not mean that the warrant was not supported by the necessary

probable cause. "[A]n [a]ffidavit supported by information supplied by [an informant]

supplies probable cause as long as that information is reasonably determined to be

reliable, which requires corroboration by independent evidence." *United States v.*

*Rekonen*, No. 07-123 (JNE/RLE), 2007 WL 2973840, at *12 (D. Minn. Oct. 9, 2007).

However, such reliability can be established through independent corroboration *or* the

informant's track record of providing trustworthy information. *United States v. Williams*,

10 F.3d 590, 593 (8th Cir. 1993). The Eighth Circuit has explained as follows:

> When a confidential informant provides information in support of a search
> warrant, the issuing magistrate considers the informant's reliability and the
> basis of his knowledge. *Gates*, 462 U.S. at 233, 103 S.Ct. 2317. The totality
> of the circumstances analysis, however, does not mandate that both factors
> be present before a warrant may issue. Instead, a strong showing of one
> may compensate for a deficiency in the other. *Id.* For example, if an
> "informant is known for the unusual reliability of his predictions of certain
> types of criminal activities in a locality, his failure, in a particular case, to
> thoroughly set forth the basis of his knowledge surely should not serve as
> an absolute bar to a finding of probable cause . . . ." *Id.; see also United*
> *States v. Anderson*, 933 F.2d 612, 615 (8th Cir. 1991). The information
> from a CRI is sufficiently reliable if it is corroborated by other evidence, or
> if the informant has a history of providing reliable information. *United*
> *States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

*United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004). "If information from an informant is shown to be reliable because of independent corroboration, ten it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Williams*, 10 F.3d at 593. Here, although the search warrant application did not reference whether the informants had provided reliable information in the past, it did include additional facts that corroborated some information that the informants provided. "Even the corroboration of minor, innocent details" can be enough to support a finding of probable cause. *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (quotations omitted). And, "the receipt of consistent information from two separate sources is a form of corroboration." *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013). Here, there was corroboration of some of the information provided, and the information provided from the informants was consistent. Detective Tschida was not required "to rule out [Markwald's] innocent explanation for suspicious facts." *D.C. v. Wesby*, 138 S. Ct. 577, 586, 588 (2018).

As to Defendant's third argument, this Court disagrees that the warrant is unconstitutionally overbroad.[2] The warrant set forth the categories of data requested and the defined period of time the request related to. The fact that the warrant sought information back in time to September 6, 2019, is not concerning, as the affidavit

---

[2]    Defendant also generally references the particularity requirement in the section of his brief relating to this search warrant. (Doc. No. 75 at 7.) As quoted above, this warrant did particularly describe the place to be searched and the things to be seized. (*See* Gov't Ex. 1 at 00000362, 00000364–365.)

11

references activity from the investigation dating back to October 2019. And identifying specific dates, times, or people with whom Markwald communicated with to narrow the information sought through the warrant is not required in this circumstance when the investigation had revealed that the narcotics distribution linked to Markwald involved multiple people and law enforcement was attempting to investigate further into the drug distribution network.

Nor is it troublesome that the particular search requested might result in a large amount of information or include some information not related to the investigation. Instead, to pass constitutional muster, the affidavit must show that based on the totality of the circumstances there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Here, there was a direct link provided in the affidavit between Markwald's Facebook Messenger account and his communications with others about drug distribution. Detective Tschida explained that other distributors' phones showed Facebook messages involving Markwald and confirmed that Markwald was a source of supply for these distributors, and Detective Tschida testified in the affidavit that it appeared to him that Markwald's main method of communication was through the Facebook Messenger application. The totality of the information therefore provided a "fair probability" that evidence of the illegal drug distribution would be found in the data recovered from Markwald's Facebook account.[3]

---

[3]    Defendant describes the May 12, 2020 warrant as seeking the "use of a pen register and trap and trace device to obtain electronic tracking information, including GPS location[,]" for Defendant's use of his Facebook account. (Doc. No. 75 at 4.) The warrant also, as the Government acknowledges, refers to certain "stored user files" such

Further, even if probable cause did not exist (which this Court concludes that it did), this was a facially valid warrant, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). This Court concludes that the good-faith exception would apply to the May 12, 2020 search warrant. There is no evidence to suggest that the officer's reliance on the warrant was not in good faith, nor is there evidence that the officer's reliance was not reasonable.

---

as photos and videos. (Gov't Ex. 1 at 00000365; *see* Doc. No. 76 at 7.) Even though the Government represents that no content data was produced pursuant to this warrant, this Court concludes that probable cause was present in the affidavit to allow for the search and seizure of such "stored user files." The Government also represents that it did not receive location data in response to this particular warrant. (Doc. No. 76 at 9.) Therefore, practically speaking, even if Defendant's motion were granted, there is no location data or content data received in response to this warrant to suppress.

For these reasons, this Court concludes that the evidence seized as a result of the execution of the May 12, 2020 search warrant should not be suppressed.

### B. June 19, 2020 Facebook Warrant for Mike.Markwald.79 and August 24, 2020 Facebook Warrant for Emjay.Darkwald[4]

After receiving information from the May 12, 2020 warrant, Detective Tschida applied for and received a search warrant on June 19, 2020, for historical data (including content) from Defendant Markwald's primary Facebook account (Mike.Markwald.79). (Gov't Ex. 2.) The affidavit in support of the June 19, 2020 warrant included the same information to support probable cause from the May 12, 2020 affidavit, with the addition of the following:

> 8. Your affiant has executed a PEN TRAP AND TRACE warrant to Facebook and has continued to see messages between Markwald and other people known to be involved with narcotics distribution.
>
> 9. In May of 2020 your affiant spoke with a cooperating defendant who advised Markwald was still moving large quantities of methamphetamine and again advised the main course of communication for Markwald's operation is via Facebook Messenger.
>
> 10. Your affiant further knows from a cooperating individual, Markwald deleted his Facebook account in early June as he was alerted to Law Enforcements ability to track Facebook messages. Your affiant already had a preservation letter submitted to Facebook for his account information your affiant is seeking.

(*Id.* at 00000371.) A warrant issued on June 19, 2020, directing the following information be disclosed by Facebook:

---

[4]    Because Defendant's challenges to these two search warrants are similar, this Court addresses them together.

- All contact information, including for user ID https://www.facebook.com/mikemarkwald.79 including but not limited to; full name, user identification number, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. All Photoprints or Videoprints, including all photos or videos uploaded by that user ID and all photos or videos uploaded by any user that have that user tagged in them;

- All Neoprints, including profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification number; groups and networks of which the user is a member, including the groups' Facebook group identification number; future and past event postings; rejected "Friend" request; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

- All other communications and messages made or received by the user, including all private messages/chat conversations and pending "Friend" requests;

- All IP logs, including all records of the IP addresses that logged into the account;

- The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including and credit card or bank account number);

- All privacy settings and other account settings;

- All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken . . . .

(Gov't Ex. 2 at 00000372.)

Approximately two months later, after receiving information from the June 19, 2021 search warrant and other information from their investigation, Detective Tschida applied for and received a similar search warrant on August 24, 2020, for historical date

(including content) from Defendant Markwald's secondary Facebook account (Emjay.Darkwald). (Gov't Ex. 3.) The affidavit in support of the August 24, 2020 warrant included the same information from the June 19, 2020 affidavit, plus additional information received from Markwald's primary account as a result of the June 19, 2020 search, and information from a July 2020 premises search warrant, which included Facebook messages from the account "Emjay Darkwald" on a phone from the scene. Detective Tschida explained that he "is aware Markwald refers to himself as Darkwald to people in his messages." (*Id.* at 00000377.) Detective Tschida also stated that it appears Markwald "created a new account not using his real name anymore" "after being tipped off about Law Enforcement[']s involvement with his Facebook," and he "is aware this is a common practice to avoid law enforcement detection." (*Id.*) In addition, Detective Tschida stated that through his investigation he "has discovered Markwald[']s main source of communication with his customers is Facebook Messenger and it appears he switched his account to avoid law enforcement." (*Id.*) The August 24, 2020 search warrant issued, directing that the same information as directed in the June 19, 2020 warrant—except for it this time coming from the emjay.darkwald account—be disclosed by Facebook. (*Id.* at 00000379.)

Defendant argues first that the June 19, 2020 and August 24, 2020 warrants lack probable cause on the same grounds he argued with respect to the May 12, 2020 warrant. Because this Court finds that probable cause supported the issuance of the May 12, 2020 warrant (as stated above), and because the same supportive information was included in the June 19, 2020 and August 24, 2020 warrants with additional information explaining

why evidence of a crime was likely to be found within the content on Markwald's Facebook accounts, it likewise finds that probable cause supported the issuance of the June 19, 2020 and August 24, 2020 warrants.

Defendant also argues that the June 19, 2020 and August 24, 2020 warrants lack particularity—which was a different argument from that asserted as to the June 19, 2020 warrant—because in these two warrants law enforcement asked for everything from Markwald's Facebook accounts without narrowing the request temporally or by limiting the request to information involving certain people who they suspected were involved in the criminal activity. Here, the warrant does specifically identify the types of data to be disclosed by Facebook. But—as the Government acknowledges—the warrant does not discuss or describe the crimes under investigation or contain a time limitation.[5] (*See* Doc. No. 76 at 12.)

The Fourth Amendment protects against unreasonable searches and seizures and requires search warrants to be supported by probable cause and to "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement "requires particularity in the warrant, not supporting documents like an application or affidavit." *United States. v. Sigillito*, 759 F.3d 913, 923–24 (8th Cir. 2014). This Court, however, need not rule on whether the

---

[5]    The Government points to evidence that Detective Tschida limited the search temporally and disclosed the nature of the crimes under investigation as "Drugs/Narcotics" when he served each warrant on Facebook and entered the search request in Facebook's portal. (*See* Gov't Exs. 7, 8.) While this evidence is indicative of the officer's good faith, it does not make the face of the warrant more particularized with respect to the nature of the crime or the time scope.

17

warrant meets the Fourth Amendment's particularity requirement. Instead, even assuming that the warrant lacked particularity, the good-faith exception to the exclusionary rule applies. *See United States v. Harris*, No. 20-cr-98 (SRN/TNL), 2021 WL 3929270, *4 (D. Minn. Sept. 2, 2021) (assuming without deciding that the Facebook search warrant was overly broad, concluding that the good-faith exception applied, and citing cases); *see also United States v. Mize*, No. 1:18-cr-74, 2020 WL 5505793, at *5 (S.D. Ohio Sept. 11, 2020) ("[A]n apparent pattern has emerged: search warrants that ask for an entire copy of a Facebook account, . . . are likely overbroad, but evidence obtained therefore is still admissible under the *Leon* good-faith exception.").[6]

The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Leon*, 468 U.S. at 906 (quotations omitted). Determining whether evidence obtained from a warrant should be suppressed is determined on a case-by-case basis. *Id.* at 918. In *Leon*, the Supreme Court held that when evidence is obtained by officers reasonably relying on a search warrant, the good-faith exception to the exclusionary rule may apply. *Id.* at 922–23. Under the good-faith exception, "disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's

---

[6]      *But see United States v. Lowry*, No. 1:15-cr-043, 2015 WL 4399627, at *3 (S.D. Ohio July 17, 2015) (finding the Facebook warrant that included request for "all communications between any user or recipient and the substance of those communications" was *not* overbroad, and that the officers were not required to limit the request to communications with two known victims).

determination that there was probable cause to issue the warrant." *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008) (internal citation omitted). "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or . . . in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation omitted). "[T]he threshold for establishing [that the *Leon* exception does not apply] is a high one, and it should be." *Id.* at 547.

Here, while the warrants did not reference a time frame or the offense in question, or limit the request to communications with certain known individuals, the applications both described various incidents and facts learned from the officer's methamphetamine distribution investigation dating back to October 2019. (*See* Gov't Exs. 2, 3.) And the search warrants themselves referenced the applications that were made, stating "WHEREAS, the application and supporting affidavit of Detective Jon Tschida *was/were* duly presented and read by the Court, and being fully advised in the premises." (Gov't Ex. 2 at 00000373; Gov't Ex. 3 at 00000380.) Courts have applied the *Leon* good-faith exception when that same language is present in the issuing warrant. *See United States v. Curry*, 911 F.2d 72, 77–78 (8th Cir. 1990); *Harris*, 2021 WL 3929270, *4.

Also here, Detective Tschida not only drafted both the applications and search warrants, but he was also the officer that directed the entire investigation, executed each warrant, and personally reviewed the material received from Facebook. (Doc. No. 85, 9/1/2021 Hearing Transcript ("Hr'g Tr.") 15, 38–40, 51.) As the Eighth Circuit stated in *Curry*, "[t]his fact is significant because in assessing whether reliance on a search warrant

19

was objectively reasonable under the totality of the circumstances, it is appropriate to take into account the knowledge that an officer in the searching officer's position would have possessed." 911 F.2d at 78. The Second Circuit has likewise found that the good-faith exception applied to a Facebook search conducted pursuant to a warrant supported by probable cause that did not include the specific offense although the application did. *United States v. Purcell*, 967 F.3d 159, 182–84 (2d Cir. 2020). There, the court explained that the officers who participated in the drafting of the warrant application materials and reviewed the produced information likely "included those already involved in the investigation into [the defendant's] suspected . . . offenses," and "[t]hus, those officers were in all likelihood fully aware of the purpose and parameters of the investigation." *Id.* Here, Detective Tschida testified that he limited the search temporally[7] and he only searched for material relevant to the parameters of the investigation. (Hr'g Tr. 20–21, 28, 31, 33, 38–39.) He also testified that before submitting the warrants to the court, he had every Facebook warrant reviewed and approved by both his supervisor and the Anoka County Attorney's Office. (Hr'g Tr. 18–19, 22, 27, 31, 33.) There is no evidence to suggest that Detective Tschida failed to act in good faith. *See Curry*, 911 F.2d at 78.

Furthermore, as the court recently found in *Harris*, "excluding the evidence here would not serve the purpose of the exclusionary rule." 2021 WL 3929270, *5. "To trigger the exclusionary rule," the law enforcement conduct "must be sufficiently deliberate that

---

[7]     The earliest date range he requested for the "Markwald" account was from 9/1/2019, and for the "Darkwald" account was from 5/31/2020. (Gov't Ex. 8; Hr'g Tr. 28–29, 31–32, 33–34.)

exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009); *see also Davis v. United States*, 564 U.S. 229, 236–38 (2011) ("[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."). Without evidence of deliberate misconduct or gross negligence, the mistakes in the Facebook warrants—i.e., not referencing the temporal limitation and not including a specific reference to the offense at issue (or further narrowing the search to certain known individuals)—when the offense and some of the individuals involved were referenced in the warrant affidavits, should not result in suppression because that would not further the purpose of the exclusionary rule. Instead, "[i]t would only serve to punish a police officer for relying on a neutral judge's conclusion that the warrant[s were] sufficiently particular." *Harris*, 2021 WL 3929270, *5; *see also Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.").[8]

---

[8]    This Court also notes that Detective Tschida testified that Facebook would not be able to conduct a more narrowed search because it does not sift through a user's account and produce data limited to messaging between two specific people. (*See* Hr'g Tr. 50 ("Q. Did you narrow it down to information between, like, messaging between two known accounts? A. As far as I'm aware, there's no way to do that with Facebook.").) Instead, his understanding was that Facebook can only produce objective categories of data (i.e., by date ranges) and then law enforcement must review the data looking for evidence of the crimes under investigation. (*See* Hr'g Tr. 51; Doc. No. 76 at 14); *see also United States v. Barnes*, No. 18-cr-120 (ADM/KMM), 2019 WL 3293467, at *10 (D. Minn. Apr. 8, 2019) (stating that "as a practical matter, the seizure of all of

Therefore, this Court finds that the good-faith exception applies to the evidence seized from the Mike.Markwald.79 and Emjay.Darkwald Facebook accounts, and Defendant's motion to suppress relating to the June 19, 2020 and August 24, 2020 search warrants should be denied.

## III.    Premises Warrants

Defendant challenges three premises warrants issued during law enforcement's investigation into Markwald's methamphetamine distribution activity. This Court addresses each of these three warrants in turn below.

### A.  Warrant to Search Premises at Old Constance Blvd

As part of the ongoing narcotics investigation, Detective Tschida obtained a warrant on December 1, 2020, to search "the following described premises: A single family residence located at [XX] Old Constance Blvd NW . . . and any appurtenant structures thereto, including garages, sheds, and storage areas and the home curtilage" in Andover, Minnesota for the following things:

> 1. Records, logs, receipt, address books, price lists, drug notations, customer lists, bank account records, safety deposit box keys and accounts, and other records showing sources of supply and profits from the sale and/or distribution of controlled substances and other written material tending to establish the existence of drug transactions
>
> 2. Items to show constructive possession of the above contraband, such as utility bills, rent receipts, lease agreements, letters, correspondence, personal identification, bills, and other written material tending to show the actual or constructive possession of the above items and their location

---

[defendant's] files and the later review of those files for evidence of criminal activity, was the most reasonable approach"), *report and recommendation adopted*, 2019 WL 2353659 (D. Minn. June 4, 2019).

3. Electronic equipment such as computers, tablets, cell phones . . .

4. Profits and proceeds from narcotics transactions including, but not limited to, monies, cash, United States and foreign currency, . . .

5. Authority to photograph the above described items and their location within the premise

6. Photographs and video maintained by the suspect which chronicle and record drug usage and transactions

7. Authority to disa[ble] and/or remove any video/audio surveillance recording devices located and any drives the data may be stored on

8. Firearms such as shotguns, rifles, handguns and ammunition for same

9. Authority to search vehicles on the property which your affiant knows to belong to Michael Markwald through physical surveillance[.]

(Gov't Ex. 4 at 00000312–13.) In addition to the information provided by Detective Tschida in the Facebook warrant affidavits, Detective Tschida also explained in his affidavit in support of this premises warrant more evidence linking Markwald to methamphetamine distribution, and also included the following:

18. Through your affiant's investigation into Markwald and reading of historical Facebook data, Markwald still keeps property and other items at his parents' residence and his driver's license address of [XX] Old Constance Blvd NW, City of Andover, County of Anoka, State of Minnesota.

19. There are several Facebook messages where Markwald has business associates come to the house and he has actually shared the location of his parent's residence with latitude and longitude on messenger directing associates into the house. Your affiant believes there is a likel[i]hood Markwald has conducted narcotics sales at the residence.

20. Your affiant is aware from CD's and CI's at the beginning of this investigation Markwald was conducting his narcotics deals from this residence but has since moved his main operation to his shop in Ham Lake.

23

21. There are Facebook messages specifically addressing property he keeps at the house, specifically in the storage shed/garage area.

22. Your affiant has Facebook messages where Markwald is talking about switching vehicles and phone numbers often to stay ahead of Law Enforcement.

23. Due to messages above your affiant believes Markwald will likely have several old cellphones at the location all of which likely contain communication from his narcotics distribution.

24. Your affiant has also seen Facebook messages have been sent to and from Markwald regarding the sale and purchase of firearms and since he is ineligible to possess firearms, he likely would keep some of them away from his primary residence in Blaine.

25. Your affiant has also seen Markwald drive several vehicles which have been seen for short periods of time at his primary residence in Blaine but then they have been replaced with other vehicles. Your affiant has conducted physical surveillance at [XX] Old Constance and has observed vehicles registering to [J.B.] who is known to be Markwald's girlfriend on the property.

26. Your affiant believes Markwald [m]ay be storing vehicles at [XX] Old Constance as well.

27. Your affiant is aware Markwald is still storing property at the address and there will likely be historical evidence of his narcotics dealing at the location.

(*Id.* at 00000310.) The search warrant for the Old Constance premises issued on December 1, 2020, and was executed on December 3, 2020; firearms, ammunition, and magazines were seized. (*Id.* at 00000305, 00000314.)

Defendant Markwald argues that the search warrant application for the Old Constance premises failed to describe a nexus between the alleged criminal activity (i.e.,

narcotics distribution) and the premises (i.e., his parents' residence), and therefore it lacked probable cause as required by the Fourth Amendment.[9]

As stated above, probable cause must be shown before a search warrant is authorized. U.S. Const. amend. IV; *Williams*, 477 F.3d at 557. In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. 213, 238 (1983).

Here, the application for the search warrant included information about Defendant Markwald—both information provided by several CIs, CDs, and other suspected targets, and information learned through surveillance and other investigation—indicating a fair probability that Markwald was illegally distributing methamphetamine and was in the illegal possession of firearms. The affidavit links the criminal activity—distribution of methamphetamine—with Defendant Markwald based on the reports of CIs and CDs that Markwald distributed methamphetamine to them or others and based on Facebook

---

[9]    It is undisputed that this premises is Markwald's parent's residence. Although Defendant's counsel states that "it was clear Markwald does not actually live there" in his brief (Doc. No. 75 at 13), the record reflects that Markwald's driver's license listed his residence at the Old Constance address. If Markwald does not claim any privacy interest in the home itself, even if he claims a privacy interest to things left in the home, then he would not have standing to challenge the warrant. *See In re United States*, 665 F. Supp. 2d 1210, 1223–24 (D. Or. 2009) (stating that a defendant who left private documents at his mother's house would not have standing to object if there were constitutional deficiencies in the warrant used to search his mother's home). Neither party, however, addressed whether Markwald has standing to challenge the search warrant for the Old Constance premises. Assuming, therefore, that Markwald does have some privacy interest in the home, this Court addresses Markwald's challenges to this search warrant.

messages confirming Markwald was involved in methamphetamine distribution. The affidavit also links Markwald's methamphetamine distribution to the Old Constance premises based on CD's and CI's reports that Markwald was conducting his narcotics deals from this residence, Facebook messages indicating that Markwald still keeps property and other items at this parents' residence, and Facebook messages showing that Markwald directs business associates to come to this location and into this house. Detective Tschida explained that he believed the Old Constance property would likely contain evidence relating to narcotics distribution including old cell phones, vehicles used for illegal activity, firearms,[10] and other "historical evidence of his narcotic dealing." (Gov't Ex. 4 at 00000310.) There is no requirement that law enforcement needed to see an actual drug transaction take place at the residence for there to be probable cause. Based on the above information, this Court concludes that the supporting affidavit for the search of the Old Constance premises does provide a proper nexus and sufficient probable cause for the search and seizure.

Defendant argues that the "information in the affidavit regarding the Old Constance residence was likely stale" because "[t]he warrant was obtained on December 1, 2020, but the information about the residence was from an unstated time prior to December." (Doc. No. 75 at 13.) However, when read in context, it is understood that it was believed that Markwald was still engaged in drug trafficking, he had directed

---

[10]    Detective Tschida stated that "since [Markwald] is ineligible to possess firearms, he likely would keep some of them away from his primary residence in Blaine." (Gov't Ex. 4 at 00000310.)

his associates to the Old Constance residence, and that he had kept some of his things there, throughout 2020 and leading up to the issuance of the December 2020 warrant. *See United States v. Jones*, No. 10-336 (JNE/AJB), 2011 WL 1837861, at *4 (D. Minn. Mar. 31, 2011) ("Reasonable inferences may be drawn from the totality of circumstances in determining whether probable cause to issue a warrant exists.") (citing *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008)). Further, the Eighth Circuit has upheld search warrants with much longer time periods between information gathering and warrant issuance than the timing in the present case. *See United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010) (upholding a search warrant issued 18 months after discovery of information related to possession of child pornography); *see also Jones*, 2011 WL 1837861, at *4 (finding not stale and stating "[t]his is particularly the case where firearms are the subject of the warrant because people who possess firearms tend to keep them for a long time") (citing *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008)); *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (stating that "there is no bright-line test for determining when information is stale" and rejecting an argument in a narcotics case involving information more than two-weeks old).

Defendant also argues that the affidavit needed more information about what was said, to whom, and when. Simply because the affidavit did not provide more detailed facts explaining what was specifically stated in the Facebook communications does not mean that the warrant was not supported by the necessary probable cause. *See Technical Ordinance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001) ("A law enforcement official is not required to include everything he knows about a subject in his affidavit,

whether it is material to a finding of probable cause or not."). This Court concludes that the information that was provided in the affidavit, considering the totality of those facts together, including the information provided by the CIs, the CDs, and the information found in the Facebook messages, established probable cause to believe that there was fair probability that evidence of the crime (illegal methamphetamine distribution) would be found at the Old Constance premises. *See, e.g.*, *United States v. Patterson*, 666 F.App'x 569, 572 (8th Cir. 2016) (finding probable cause to search a house where suspected drug dealer "came and went from a house in close proximity to her suspicious meetings"). Therefore, Defendant's motion as to this warrant should be denied.

### B.  Warrant to Search Premises on Highway 65 (Ham Lake Shop)

On December 1, 2020 (the same day as the Old Constance premises warrant was obtained), Detective Tschida obtained a warrant to search "A business located at [XXXXX] Highway 65 NE Unit 114" in Ham Lake, Minnesota ("the Ham Lake Shop") for the following things:

1. Controlled substances possessed without authority of law, including but not limited to methamphetamine

2. Primary containers used to store, preserve or conceal the above-described controlled substances;

3. Dispensing equipment and drug paraphernalia . . . ;

4. Records, logs, receipt, address books, price lists, drug notations, customer lists, bank account records, safety deposit box keys and accounts, and other records showing sources of supply and profits from the sale and/or distribution of controlled substances and other written material tending to establish the existence of drug transactions;

28

5. Items to show constructive possession of the above contraband, such as utility bills, rent receipts, lease agreements, letters, correspondence, personal identification, bills, and other written material tending to show the actual or constructive possession of the above items and their location;

6. Authority to answer the telephone while present at the residence and engage in conversation with individual(s) calling.

7. Electronic equipment such as computers, tablets, cell phones . . .

8. Profits and proceeds from narcotics transactions including, but not limited to, monies, cash, United States and foreign currency, . . .

9. Authority to photograph the above described items and their location within the premise;

10. Photographs and videotapes maintained by the suspect which chronicle and record drug usage and drug transactions.

11. Authority to properly dispose of any hazardous materials recovered.

12. Authority to disable and/or remove any video/audio surveillance recording devices located and any drives the data may be recorded on.

13. Firearms such as shotguns, rifles, handguns and ammunition for same;

14. Authority to use a narcotics K9 to sniff cars associated with Markwald or Markwald's leased parking spots in the shared fenced in area of the business complex.

(Gov't Ex. 5 at 00000334–35.) Detective Tschida again included the information that had

been provided in the Facebook warrant affidavits, including that –

in December of 2019 your affiant spoke with a Confidential Informant (CI) whose identity is fully known to your affiant. This CI advised the methamphetamine [S.] was caught with was purchased from Markwald. The CI advised they had intimate knowledge of Markwald's operation and knew [S.] was a frequent customer of Markwald's. The CI provided information on Markwald running his operation out of a shop in Ham Lake, County of Anoka, State of Minnesota. The CI advised the shop was just south of the Americinn off of Highway 65. The CI advised Markwald keeps

significant weight in the shop. Your affiant was able to find and identify the shop located at [XXXXX] Highway 65 NE, Unit 114, in the City of Ham Lake, County of Anoka, State of Minnesota. Your affiant has conducted continued surveillance at the shop and has seen several known drug dealers coming and going from the shop. Your affiant has also seen Markwald's vehicles coming and going from the shop.

(*Id.* at 00000329.) In addition, Detective Tschida provided the following information in the affidavit in support of the Ham Lake Shop premises warrant:

15. Your affiant also participated in a proffer with another cooperating defendant whose identity is fully known to me. During this proffer the CD advised they were working with Markwald from August of 2019 until the time of their arrest in or about the spring of 2020. The CD advised they were moving 2-3 pounds of methamphetamine weekly for Markwald and knew of people who are still actively dealing with Markwald. During the course of this proffer the CD was able to pick out Markwald from a photo line up and was also able to identify the shop location. The CD also advised the pickups of large amounts of methamphetamine was almost always done at the shop.

16. Your affiant has photos of the CD at the shop, GPS data, and physical surveillance of the shop which are of the CD. These corroborate the accounts given by the CD.

17. Your affiant has continually monitored the data provided by Facebook and has seen the continued communications with persons who have been identified in your affiant's investigation as being involved with the sales and distributions of methamphetamine.

18. During the course of the Facebook warrants there have been several pings to his shop at [XXXXX] Highway 65 NE. Your affiant also has done physical surveillance at the shop and has seen consistent short-term traffic. Your affiant is aware this business complex has several different businesses. Your affiant has seen traffic coming and going at some of the other businesses during regular business hours. Your affiant has conducted surveillance with the use of a pole camera and has seen traffic coming and going from Markwald's shop at all hours of the night. These stops range in time but are usually shorter in nature consistent with narcotics activity.

19. Your affiant has physically seen Markwald at the shop several times over the whole investigation stemming almost a year.

30

20. Your affiant has continued to monitor the Facebook pen trap and trace and has seen recent communications from Markwald to and from other people who have been identified as being involved in the distribution of methamphetamine as a part of Markwald's group.

21. Your affiant is also aware through surveillance Markwald drives several different cars. Your affiant has seen Markwald driving different cars throughout the investigation. Your affiant is aware from Facebook messages and statements from CI's and CD's that he has space in a large fenced in area where he stores some of these cars.

(*Id.* at 00000331–32.) The Ham Lake Shop premises search warrant issued on December 1, 2020, and was executed on December 3, 2020; firearms, ammunition, magazines, cell phones, methamphetamine, heroin, and drug paraphernalia were seized. (*Id.* at 00000326, 00000337.)

Defendant argues that the Ham Lake Shop search warrant "contains stale information and lacks specificity to the point there is no probable cause." (Doc. No. 75 at 15.) This Court disagrees. Similar to the Old Constance premises warrant application, the information provided in the application was sufficient to support probable cause and was not stale. As referenced above, there was specific information provided in the affidavit linking Markwald to methamphetamine distribution activity and there was specific information linking the suspected methamphetamine distribution activity to the Ham Lake Shop. And, when the paragraphs are read in context, it is understood that the information provided by the CD about the Ham Lake Shop being used as a location for Markwald's drug distribution activity included activity that occurred before the spring of 2020 and after the spring of 2020. In addition, the affidavit indicates there were pings to the Ham Lake Shop during the course of the Facebook warrants—meaning that those

occurred in the summer and fall of 2020, leading up to this December warrant—and the affidavit indicates that there were "continued communications with persons who have been identified in your affiant's investigation as being involved with the sales and distributions of methamphetamine." (Gov't Ex. 5 at 00000331.) Under the circumstances of this investigation—with it being over a year-long investigation—the information learned over the course of 2020 relating to Markwald's involvement in methamphetamine distribution was not stale information. *See, e.g.*, *Lemon*, 590 F.3d at 614 (upholding a search warrant issued 18 months after discovery of information). And again, there did not need to be a controlled buy from this shop, nor did there need to be a vehicle stop resulting in seized drugs, for there to be probable cause supporting the issuance of this warrant. There only need be information provided in the affidavit, when considering the totality of those facts together, that establishes probable cause to believe that there was a fair probability evidence of the crime would be found at the Ham Lake Shop premises. *See Jones*, 2011 WL 1837861, at *4 ("Reasonable inferences may be drawn from the totality of circumstances in determining whether probable cause to issue a warrant exists."). Here, there was. Therefore, Defendant's motion to suppress as it relates to the Ham Lake Shop premises warrant should be denied.

### C.  Warrant to Search Premises at Pierce Place

The final search warrant that Defendant challenges in his motion to suppress is the December 1, 2020 warrant to collect a DNA sample from Markwald and search for other things at a "single family residence located at [XXXXX] Pierce Place NE" in Blaine, Minnesota, "and any appurtenant structures thereto, including garages, sheds and storage

areas and the homes curtilage." (Gov't Ex. 6 at 00000323.) This location was known to be Markwald's girlfriend's residence. The warrant specifically allowed law enforcement to search for the following things:

> 2. Records, logs, receipt, address books, price lists, drug notations, customer lists, bank account records, safety deposit box keys and accounts, and other records showing sources of supply and profits from the sale and/or distribution of controlled substances and other written material tending to establish the existence of drug transactions

> 3. Items to show constructive possession of the above contraband, such as utility bills, rent receipts, lease agreements, letters, correspondence, personal identification, bills, and other written material tending to show the actual or constructive possession of the above items and their location

> 4. Electronic equipment such as computers, tablets, cell phones . . .

> 5. Profits and proceeds from narcotics transactions including, but not limited to, monies, cash, United States and foreign currency, . . .

> 6. Authority to photograph the above described items and their location within the premise

> 7. Photographs and video maintained by the suspect which chronicle and record drug usage and transactions

> 8.Authority to disa[ble] and/or remove any video/audio surveillance recording devices located and any drives the data may be recorded on

> 9. Firearms such as shotguns, rifles, handguns and ammunition for same

> 10. Authority to search vehicles on the property[.]

(Gov't Ex. 6 at 00000323–24.)

Detective Tschida again provided the information that had been provided in the Facebook warrant affidavits, along with other information learned indicating Markwald's involvement in methamphetamine distribution, and he also included the following

information indicating that Markwald was using his girlfriend's residence as his

residence:

18. Through your affiant's investigation your affiant has found Markwald to be residing at [XXXXX] Pierce Place NE, City of Blaine, County of Anoka, States of Minnesota. Your affiant has also been able to link an IP address consistently used by Markwald's Facebook account which registers to Century Link. A subpoena was issued for the subscriber information to Century Link and the IP address belongs to [XXXXX] Pierce Place NE.

19. Your affiant has also obtained several latitude and longitude pings from Markwald's Facebook showing him at the address.

20. In reading historical Facebook messages it does not appear Markwald conducts business at this residence as he lives with his girlfriend . . . . A majority of the CD's and CI's your affiant has spoken with over the course of this investigation have not known where Markwald actually lives. Your affiant knows from training and experience it is common for large scale narcotics distributors to have a safe house where they don't allow customers to know about.

21. Your affiant is aware large distributors of narcotics often keep their assets from their business at these safe houses.

22. Your affiant also is aware Markwald has a currently active Anoka County Warrant for 2nd degree controlled substance crimes.

23. During the course of this investigation your affiant has collected several pounds of methamphetamine from different search warrants. Your affiant has collected these narcotics for DNA processing. Your affiant believes much of these narcotics will have Markwald's DNA on them.

24. Your affiant has conducted physical surveillance at the Pierce Place address and has seen Markwald come and go from the location on several occasions. Your affiant has also seen several different vehicles parked in the same place Markwald routinely parks the vehicle he is currently driving.

25. Your affiant has Facebook messages where Markwald is talking about switching vehicles and phone numbers often to stay ahead of Law Enforcement.

26. Due to messages above your affiant believes Markwald will likely have several old cellphones at the location all of which likely contain communication from his narcotics distribution.

27. Your affiant has also seen Facebook messages have been sent to and from Markwald regarding the sale and purchase of firearms.

28. During the year long investigation into Markwald your affiant has seen him living at the Pierce Place address the whole time. He spends most nights there and his vehicles are usually found there. Your affiant has established through Pings, IP addresses, and physical surveillance that Markwald is currently resid[ing] at the Pierce Place address. Through your affiants training and experience there is a very high likely hood [sic] Markwald stores his proceeds and other important documents to his narcotics distribution at this residence.

(Gov't Ex. 6 at 00000320–21.) The Pierce Place premises search warrant issued on

December 1, 2020, and was executed on December 3, 2020; cell phones, U.S. currency,

and a known DNA sample from Markwald were seized. (*Id.* at 00000315, 00000325.)

Markwald argues that the Pierce Place search warrant affidavit fails to show

probable cause. He generally states that he "incorporates his earlier arguments regarding

probable cause" from his challenges to the other warrants. (Doc. No. 75 at 17.) First, any

argument as to staleness fails for the same reasons stated above with respect to the other

premises warrants. Defendant's other argument appears to be an argument asserting lack

of nexus. He asserts that the "residence was most likely associated with Markwald's

girlfriend and not part of a distribution network," and that because "Markwald likely did

not conduct business there also means he would be unlikely to keep drug profits or other

evidence there." (*Id.* at 16.)

As with the other affidavits, the affidavit in support of the Pierce Place warrant

includes more than sufficient information that links Markwald to narcotics distribution.

This affidavit also includes sufficient information to support the conclusion that there was a fair probability evidence of the crime of methamphetamine distribution would be found at the Pierce Place premises, even if it is true that Markwald likely did not conduct his business there. The affidavit includes Detective Tschida's statement that based on his training and experience "it is common for large scale narcotics distributions to have a safe house where they don't allow customers to know about," and he "is aware large distributors of narcotics often keep their assets from their business at [their] safe houses." (Gov't Ex. 6 at 00000321.) Detective Tschida stated he believed based on the Facebook messages "Markwald will likely have several old cellphones at the location all of which likely contain communication from his narcotics distribution." (*Id.*) He also saw "Facebook messages . . . sent to and from Markwald regarding the sale and purchase of firearms." (*Id.*) In addition, Detective Tschida stated that "[d]uring the year long investigation into Markwald[, he] has seen him living at the Pierce Place address the whole time." (Gov't Ex. 6 at 00000321.) The affidavit further links Markwald to the Pierce Place address through surveillance, including observation of his vehicles usually being parked there, observation that he spends most nights there, and pings and IP addresses consistently used by Markwald's Facebook account tracing back to this address. Based on this evidence, it was reasonable for Detective Tschida to conclude that Markwald was living at the Pierce Place address. And it was also reasonable for Detective Tschida to conclude that evidence of the crime—including cell phones, assets, firearms, and Markwald's own DNA—would be found at this location. *See United States v. Cowling,* 648 F.3d 690, 696 (8th Cir. 2011) ("[P]eople generally keep [firearms] at

home or on their persons.") (quotations omitted); *United States v. Keele*, 589 F.3d 940, 943–44 (8th Cir. 2009) (holding that an agent's affidavit explaining their experience with how people utilize their residences for illicit behavior was sufficient for a nexus after knowing that Defendant was engaged in some illegal activity).

Therefore, based on the inclusion of the above information in the Pierce Place search warrant affidavit, the warrant application provides the required nexus and the totality of the information provided supports finding the warrant is supported by probable cause.

### D. Leon Good-Faith Exception

Finally, even if probable cause did not exist for the above three premises warrants, all three were facially valid warrants, and therefore the *Leon* good-faith exception to the exclusionary rule should be considered. "[I]f the executing officer's good-faith reliance on the warrant is objectively reasonable," then the evidence seized is admissible. *Perry*, 531 F.3d at 665. Here, this Court concludes that the good-faith exception would apply to all three premises warrants. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable.

Therefore, for all of the above reasons, this Court concludes that the evidence seized as a result of the execution of the three premises search warrants should not be suppressed and Defendant's motion should be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence from Illegal Search and Seizure

(Doc. No. 52) be **DENIED**.

Date:  November 4, 2021                    *s/ Becky R. Thorson*
                                            BECKY R. THORSON
                                            United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **November 18, 2021**. A party may respond to those objections by **December 2, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.